UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
TRAMP MARITIME ENTERPRISES LTD,

                              Plaintiff,

-v-

NT SHIPPING MARSHALL ISLANDS,

                              Defendant.
-------------------------------------------------------------x

08 CV 9926 (RMB)

**VERIFIED COMPLAINT**

Plaintiff, TRAMP MARITIME ENTERPRISES LTD, (hereinafter "TRAMP

MARITIME"), by its attorneys, CHALOS & CO, P.C., as and for its Verified Complaint

against Defendant NT SHIPPING MARSHALL ISLANDS (hereinafter "NT

SHIPPING"), alleges upon information and belief as follows:

<u>JURISDICTION</u>

1.      The Court has subject matter jurisdiction by virtue that the underlying

claim herein is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and within the admiralty and maritime jurisdiction of

this Court under 28 U.S.C. § 1331 and 1333.


<u>THE PARTIES</u>

2.      At all times material hereto, Plaintiff, TRAMP MARITIME, is a foreign

business entity duly organized and existing pursuant to the laws of Liberia.

3.      At all times material hereto, Defendant, NT SHIPPING, was and still is a

foreign business entity duly organized and existing pursuant to the laws of the Marshall

Islands.

FACTS AND CLAIM

4.      On or about October 18, 2007, NT SHIPPING, as owner of the M.V.

"PIRGOS", and TRAMP MARITIME as charterers, entered into an amended New York

Produce Exchange Form 1946 charter party agreement for use of the vessel.  A copy of

the charter party agreement is attached hereto as Exhibit "A".

5.      The charter party agreement is a maritime contract.

6.      Defendant NT SHIPPING removed the M/V "PIRGOS" from service on

or about September 17, 2008 and failed to return the vessel to charter service.

7.      As a result of Defendant NT SHIPPING's failure to fulfill its obligations

in accordance with the parties' agreement, TRAMP MARITIME has sustained damages

due to overpaid hire in the amount presently estimated to be USD 522,626,04.

8.      Despite repeated demands for payment, Defendant NT SHIPPING has

failed, neglected and/or refused to make payment of said sums due and owing to Plaintiff

TRAMP MARITIME.

9.      Pursuant to the terms of the maritime contract, all disputes arising there

under are to be submitted to London arbitration with English law to apply.  English law

provides that the prevailing party is entitled to interest, costs and legal fees.

10.     Plaintiff TRAMP MARITIME intends to refer the dispute to London

arbitration if it does not timely receive the amounts due and owing to it from Owners.  As

best as can now be estimated, TRAMP MARITIME expects to recover the following

amounts from Defendants if it proceeds to London arbitration:

        A.      Principal claim:                              *$ 522,626.04*

| B. | Estimated interest on Principal claim: 3 years at 7.5%, compounded quarterly | *$ 130,508.28* |
|---|---|---|
| C. | Estimated attorneys' fees: | *$ 250,000.00* |
| D. | Estimated arbitration costs/expenses: | *$100,000.00* |
| | **Total Claim** | **$ 1,003,134.32** |

11.     Therefore, TRAMP MARITIME's total claim for breach of the maritime

contract against Defendants is in the aggregate US$ 1,003,134.32.

<u>BASIS FOR ATTACHMENT</u>

12.     Defendants cannot be found within this district within the meaning of Rule

B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal

Rules of Civil Procedure, but Defendants are believed to have or will have during the

pendency of this action, certain assets, accounts, freights, monies, charter hire, credits,

effects, payment for bunkers, goods or services, bills of lading, cargo and the like

belonging to or claimed by the Defendants within this District held by various parties, as

garnishees, including by not limited to electronic fund transfers.

13.     Plaintiff believes that some of these assets, to wit: bank accounts;

payments from the purchasers of cargoes; freight and/or hire payments to or from owners

of vessels, or charterers, to Defendants, and/or Clearing House Interbank Payment

System (CHIPS) credits or funds being transferred through intermediary banks, are

located in this District in the possession of garnishees, including ABN AMRO BANK,

American Express Bank, Bank of America, Bank of China, Bank of New York, Bank of

Tokyo Mitsubishi Ltd., Barclay's Bank, BNP Paribas SA, Calyon, Calyon Financial, Inc.,

Chase Manhattan Bank, Citibank N/A, Credit Suisse Securities (USA) LLC, Deutsche

Bank, HSBC (USA), JP Morgan Chase Bank, Societe Generale, Standard Chartered

Bank, UBS AG, U.S. Bank, Wachovia Bank, Wells Fargo Bank, CHIPS and possibly other banks or financial institutions located in New York.

WHEREFORE, Plaintiff prays:

A.     That process in due form of law issue against the Defendant, citing them to appear and answer under oath all, and singular, the matters alleged in the Verified Complaint;

B.     That since the Defendant cannot be found within the District, as set forth in the Declaration of George M. Chalos, and pursuant to Rule B and Rule E of the Supplemental Rules of Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B and Rule E of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all of Defendants' tangible or intangible property or any other funds held by any garnishees in the district which are due and owing, or other property of the Defendant, up to the amount of US$ 1,003,134.32 to secure and satisfy the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B and Rule E answer the matters alleged in the Complaint;

C.     That Plaintiff may have such other, further and different relief as may be just and proper.

Dated: Oyster Bay, New York
　　　November 17, 2008

　　　　　　　　　　　　　　CHALOS & CO, P.C.
　　　　　　　　　　　　　　Attorneys for Plaintiff
　　　　　　　　　　　　　　TRAMP MARITIME ENTERPRISES LTD

　　　　　　By:　_____
　　　　　　　　　　　　　　George M. Chalos (GC-8693)
　　　　　　　　　　　　　　123 South Street
　　　　　　　　　　　　　　Oyster Bay, New York 11771
　　　　　　　　　　　　　　Tel: (516) 714-4300
　　　　　　　　　　　　　　Fax: (866) 702-4577
　　　　　　　　　　　　　　Email: gmc@chaloslaw.com

# Time Charter

GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1 **This Charter Party**, made and concluded in *London* ........................................... *18th* ......... day of *October* .......................... ~~19~~ *2007*

2 Between Messrs *" NT SHIPPING MARSHALL ISLANDS"* .............................................................................................................

3 Owners of the good *St. Vincent and the Grenadines flag* ~~Steamship~~/Motorship *M/V "PIRGOS"* ........................................ of ......................

4 of *10,230* ................. tons gross register, and *6,259* ............... tons net register, having engines of .............................. indicated horse power

5 with hull, machinery and equipment in a thoroughly efficient state, and classed *Lloyds 100A1 - See Clause 66*

6 at ....................................................... of about ...................... cubic feet bale capacity, and about *17,167 metric* ....................... tons ~~of 2240 lbs.~~

7 deadweight capacity (cargo and bunkers, including fresh water and stores ~~not exceeding one and one-half percent of ship's deadweight capacity,~~

8 ~~allowing a minimum of fifty tons~~) on a draft of *9.500 metres* ~~feet~~ ........................... inches on *salt* ............. Summer freeboard, inclusive of permanent bunkers,

9 which are of the capacity of about ....................................................................... tons of fuel, and capable of steaming, fully laden, under good weather

10 conditions about ....................................... knots on a consumption of about ............................. tons ~~of best Welsh coal - best grade fuel oil - best grade Diesel oil,~~

11 now *trading*.................................................................................................................................................................................................

12 ....................................... and Messrs *"TRAMP MARITIME ENTERPRISES LTD"* Charterers of the City of *Liberia* ......................

13 **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14 ~~about~~ *a time charter period about 11/13 months, in charterers option further about 3 months which to be declared latest on expiring 11 month of the Time Charter, about means 15 days more or less in charterers option on the final declared period.* ........

15 *Trading world wide always via safe ports berths always afloat always accessible, except NAABSA in Argentina, Brasil, Buenaventura.* within below mentioned trading limits.

16 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
17 the fulfillment of this Charter Party.

18 Vessel to be placed at the disposal of the Charterers, ~~at~~ *on dropping last outward sea pilot one safe port full Atlantic or one safe port South*
19 *Africa* .............................................................................................................................................................................................

20 ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as~~
21 ~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5.~~ Vessel on her delivery to be
22 ready to receive *any permissible* cargo with clean-swept holds and tight, staunch, strong and in every way fitted *and fit always within vessel's description* for the service, having water ballast, *cranes* /winches and

23 donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the *cranes*/winches at one and the same
24 time (and with full complement of officers, seamen, engineers and firemen *according to regulations* for a vessel of her tonnage), to be employed, in carrying lawful merchan-

25 dise, ~~including petroleum or its products, in proper containers,~~ excluding *See Clause 44 - Cargo Exclusions*.................................................
26 ~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,~~
27 ~~all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North~~
28 ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~
29 ~~Mexico, and/or South America~~.............................................................................................................................................~~and/or Europe~~
30 ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~
31 ~~October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,~~
32 ........................................................................................................................................................................................................
33 ........................................................................................................................................................................................................
34 ........................................................................................................................................................................................................

35 as the Charterers or their Agents shall direct, on the following conditions:

36     1.    That the Owners shall provide and pay for all provisions, *boatage for their own business*, wages and consular shipping and discharging fees of the Crew; *also consular fees pertaining to vessel's nationality and all garbage removal excluding cargo garbage*, shall pay for the
37 insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep
38 the vessel in a thoroughly efficient state in hull, *holds*, machinery and equipment *with all certificates necessary to comply with port authorities requirements*, for and during the service.

39     2.    That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *compulsory and customary* Pilotages, Agencies, Commissions, *Seaways, Canals, River Tolls and compulsory gangway watchmen if required, taxes, dues, fees on cargoes and on sub-hires, stevedore expenses,*

40 Consular Charges (except those pertaining to the Crew *and flag of the vessel*), and all other usual expenses except those before stated, but when the vessel puts into
41 a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42 illness of the crew *or cargoes carried prior to delivery* to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
43 charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period
44 of six months or more. *See Clause 29.*

45     Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46 Owners to allow them the use of any dunnage and shifting boards *and lashing equipment* already aboard vessel. Charterers to have the privilege of using

shifting boards

47 for dunnage, they making good any damage thereto. *The charterers shall be responsible for replacement and making good the lashing/securing materials damaged during the Charter.*

48 3.   That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on

49 board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than ................................................................tons and not more than

50 ................................................tons and to be re-delivered with not less than ................................................................tons and not more than ............................................tons.

51 4.   That the Charterers shall pay for the use and hire of the said Vessel at the rate of *See Clause 101*......................................................................

52 ..............................................................................................United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and

53 stores, on ................................................summer freeboard, per Calendar Month, commencing on and from the day *and time* of her delivery, as aforesaid, and at

54 and after the same rate for any part of a month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

55 wear and tear excepted, to the Owners (unless lost) at *See Clause 96*..............................................................................................................................................

56 ..........................................unless otherwise mutually agreed. Charterers are to give Owners not less than *20/15 days approximate and 5/3 days definite*

57 notice of vessels expected date of re-delivery, and probable port. *See Clause 52*

58 5.   Payment of said hire to be made *into Owner's nominated Bank* in New York in cash in United States Currency, semi-monthly *15 days* in

advance, and for the last half month *15 days* or

59 part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60 due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61 hire, or bank guarantee, or on any *fundamental* breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

62 terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from *the date and hour the vessel has been*

*placed at Charterer's disposal as per line 18.* 7 a.m. on the working day

63 following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they

64 to have the privilege of using vessel at once, such time used to count as hire.

65 Cash for vessel's ordinary disbursements at any port *upto equivalent USD 3,000 each port excluding cash to Master,* may be advanced as

required by the Captain, by the Charterers or their Agents, subject *to Owner's prior approval*

66 to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67 of such advances.

68 6.   That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe* place that Charterers or their Agents may

69 direct, provided the vessel can safely lie always afloat at any time of tide, except at such places *at Argentina/Brazil/Buenaventura* where it is customary

for similar size vessels to safely

70 lie aground.

71 7.   That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also

72 accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73 tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow, Charterers

74 paying Owners ............................................per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are

75 incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.

76 8.   That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77 boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78 agency; and Charterers are to load, stow, and trim *dunnage, lash, unlash, secure, discharge and tally* the cargo at their expense under the supervision

of the Captain, who is to sign Bills of Lading for

79 cargo as presented, in conformity with Mate's or Tally Clerk's receipts. *However, the Master and Owners nevertheless to remain ultimately*

*responsible for the seaworthiness and safety of the vessel in all circumstances.*

80 9.   That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81 receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82 10.  That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel *at his own risk and always provided*

*prior to his boarding he/Charterers have signed and delivered to vessel's Master Owner's relevant Letter of Indemnity,* and see that

voyages are prosecuted

83 with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

84 rate of $1*0*.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally

85 Clerks, Stevedore's Foreman, etc., Charterers paying *USD 1,100 lumpsum monthly for cables, victualling, entertainment* at the current rate per

meal, for all such victualling.

86 11.  That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

87 Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-

88 terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the con-

89 sumption of fuel.

90 12.  That the Captain shall use diligence in caring for the ventilation of the cargo. *Charterers to give Master specific instructions in respect*

*with ventilation.*

91 13.  That the Charterers shall have the option of continuing this charter for a further period of ................................................................................................

92 ..................................................................................................................................................................................................................................................

93 on giving written notice thereof to the Owners or their Agents ................days previous to the expiration of the first-named term, or any declared option. *See line 15*

94 14.  That if required by Charterers, time not to commence before *1st January, 2008.*................................................................... and should vessel

95 not have *been delivered* given written notice of readiness on or before *30th January, 2008 to be narrowed to 15 days soread by 1st*

*December* but not later than 4 p.m. Charterers or

96 their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's *arrival at delivery port.* readiness.

97 15.  That in the event of the loss of time from deficiency, *default and/or strike* of officers and/or crew, of men or stores, fire, breakdown or

98 damages to hull, machinery or equipment,

99 grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause

preventing the full working of the vessel, the payment of hire shall cease for the time thereby *actually lost; until the vessel has returned to same or*

*equidistant position,* and if upon the voyage the speed be reduced by

100  defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101  thereof, and all *proven direct* ~~extra~~ expenses shall be deducted from the hire.

102  16.  That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105  The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106  purpose of saving life and property.

107  ~~17.  That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York,~~
108  ~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for~~
109  ~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~ *See Clause 78.*

110  18.  That the Owners shall have a lien upon all cargoes, and all sub-freights/*sub hires* for any amounts due under this Charter, including General Aver-
111  age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112  deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113  might have priority over the title and interest of the owners in the vessel.

114  19.  That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115  Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of
116  York-Antwerp Rules *1994 and all subsequent amendments in London* 1924, at such port or place in the United States as may be selected by the
     carrier; and as to matters not provided for by these

117  Rules, according to the laws and usages at the port of *London* New York. ~~In such adjustment disbursements in foreign currencies shall be exchanged into~~
118  ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
119  ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
120  ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
121  ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
122  ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
123  ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~
124  ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
125  ~~United States money.~~

126  ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
127  ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
128  ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129  ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
130  ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131  ~~ships belonged to strangers.~~

132  Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

133  20.  Fuel/*Diesel* used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and stoves to be~~ agreed to as to quantity, and the
134  cost of replacing same, to be allowed by Owners.

135  ~~21.  That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
136  ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
137  ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~

138  ....................................................................................................................................................................................................................
139  ....................................................................................................................................................................................................................

140  22.  Owners shall maintain the gear of the ship as fitted, providing gear (for all *cranes/winches* derricks) capable of handling lifts up to *maximum*
     *capacity in accordance with Description Clause* three tons, also

141  providing ropes, falls, slings and blocks *as on board.* ~~If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~
142  ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.~~ Owners also to provide on the vessel *power and electric light*
     *sufficient for night worl in all holds.* lanterns and oil for

143  ~~night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense.~~ The
144  Charterers to have the use of any gear on board the vessel.

145  ~~23.  Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;~~
146  ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~
147  ~~deck hands and dockeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
148  ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~
149  ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~
150  ~~thereby.~~ *See Clause 74.*

151  24.  It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152  in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels;
153  etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the *Clauses enumerated in Clause*
     *57.* following clauses, both

154  of which are to be included in all bills of lading issued hereunder.

155  U. S. A. Clause Paramount

156  ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
157  ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
158  ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
159  ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

160  Both to Blame Collision Clause

161  ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162  ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163  ~~hereunder will indemnify the Carrier against all loss or liability to the other or non carrying ship or her owners in so far as such loss~~
164  ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
165  ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non carrying ship or her~~
166  ~~owners as part of their claim against the carrying ship or carrier.~~

167     25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169 port or to get out after having completed loading or discharging. *Vessel is not ice classed and she should never be required to force ice neither*
*to follow ice breakers.*

170     26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, *acts of pilots and tugboats,* insurance, crew, and all other matters, same as when trading for their own account.

172     27. A commission of 2 1/2 *1.25* per cent is payable by the Vessel and Owners to *OPTIMA SHIPBROKERS LTD* ..............................................................
173 ...................................................................................................................................................................................................................................
174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175     28. An address commission of 2 1/2 *3.75* per cent payable to *Charterers* ............................................... on the hire earned and paid under this Charter.

*Attached Rider Clauses Nos 29 to 109, both inclusive, together with New Both-to-Blame Collision Clause, New Jason Clause,*
*General Paramount Clause and Conwartime 1993 Clause, C-TPAT Clause, US Customs Advance Notification/AMS Clause,*
*BIMCO Bunker Fuel Sulphur Content Clause, to be deemed part of and incorporated in this Charter Party.*

*THE OWNERS*                                                            *THE CHARTERERS*

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship
Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the
insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having
been made by the licensee or end user as appropriate and not by the author.

**RIDER CLAUSES TO M/V "PIRGOS" CHARTER**
**PARTY DATED 18TH OCTOBER 2007**

**Clause 29 :**
Vessel to have on board valid international certificates, including Oil Pollution Certificates, necessary for the agreed trading limits and such certificates to be maintained throughout the period of the Charter. Any consequences due to vessel lacking necessary international certificates, or if same should be outdated, to be for Owner's risk and expense. Vessel also to have on board valid Deratization or Deratization Exemption Certificates and such certificates to be maintained throughout the period of the Charter.

**Clause 30 :**
Officers and crew to comply with vaccination and sanitary regulations in all ports of call and corresponding certificates to be available on board. My detention and/or fines resulting from not having these certificates on board to be for Owner's account.

**Clause 31 :**
Owners warrant that vessel possesses valid International Tonnage Measurement Certificate pursuant to the 1969 Convention.

**Clause 32 :**
Owners to be responsible for any consequences owing to smuggling by vessel's officers and/or crew unless such smuggling is caused by Charterer's servants/representatives in which case Owners and vessel are not responsible.

**Clause 33 :**
Vessel's cargo gear and all other equipment including hold access arrangements shall comply with the regulations of the countries to which the vessel may trade. If stevedores, longshoremen or other workmen are not permitted to work due to failure of Master and/or Owner's agents to comply with aforementioned regulations, then Charterers may suspend hire pro rata for the time thereby lost and Owners to pay all extra expenses incurred directly and resulting from such failure.

**Clause 34 :**
Owners warrant that the vessel is suitable for grab discharge as far as a tweendecker of her type, size and description can be. Charterers to have the privilege of using rubber wheeled bulldozers in vessel's hold subject to Master's discretion and ships plate-strength allowance.

Vessel is approved for grain carriage in accordance with Part C, Chapter VI of 1974 Solas Convention as amended 1991 Acc Grain Loading Manual in any "filled" compartment the bulk grain shall be trimmed so as to fill all the space under the decks and hatchcovers to the maximum extent possible (i.e. no dispensation for untrimmed ends).

**Clause 35 :**
Deleted

1

**Clause 36 :**
Deleted


**Clause 37 :**
Deleted


**Clause 38 :**
Owners warrant that the vessel has not traded to Israel and that the vessel and/or Owners (or any other vessel under the same ownership) are not blacklisted by the Arab countries nor anywhere else within the agreed trading limits.


**Clause 39 :**
Vessel to be delivered on dropping last outward sea pilot one safe port full Atlantic or one safe port South Africa. Any notices to be sent to :
TRAMP MARITIME ENTERPRISES
Tel     : 210 – 8994773 / 210 - 8994770
Fax     : 210 - 8994677
E-mail : tramp@tramp.gr


**Clause 40 :**
Deleted.


**Clause 41 :**
Before arrival at first port of loading vessel to be ready in every respect to load any permissible cargo and vessel to be clear of any obstacles that may be hindering loading, stowage and discharging. Exposed cables and pipes to be entirely and properly protected by vessel.


**Clause 42 :**
Before arrival at first port of loading, vessel's holds to be thoroughly clean and dry in order to pass cleanliness survey as required. Should vessel fail to pass such cleanliness survey, then vessel to be off-hire from the time of rejection pro rata per hold rejected until fully accepted by Charterer's surveyor.


**Clause 43 :**
A joint on-hire survey at the first loading port and off-hire survey at the last discharge port is to be held to ascertain the vessel's general condition and bunker quantity remaining onboard the vessel. Cost of same to be shared equally.

Owners have the right to appoint vessel's Master and/or Chief Engineer to represent them as their surveyor during on/off hire survey including bunkering surveys in which case each party to be responsible to cover the cost of their own appointed surveyors.

2

**Clause 44 : Cargo Exclusions Clause**

All dangerous, explosive, combustible, injurios, toxic, corrosive and inflammable goods acids ammonium nitrate Ammonium chlorine ,aluminium ferro silicon powder including briguettes, aluminiumnitrate, aluminium silicon powder - uncoated, aluminium smelting by-products, asbestos, ashes, barium nitrate, borax, bleachingpowder, calcium carbit, calcium nitrate, calcium chloride, calciumhypochlorite (including all cargoes/products that are or contain orare related to calcium hypochlorites), calcium oxychloride, caporit, chloride of lime, chlorinated lime ,hy-chlor, carbide caustic soda, caustic potash ,castor beans, Chilean saltpeter, cement (but bagged cement allowed), clinker, chrome cake ,concentrates (Charterers however have the option to carry concentrates provided that sameare loaded /stowed and discharged in accordance with IMO /local/ Solas Regulations and recommendations), ferro silicon ferroPhosphorus including briquettes, ferrous metal borings (shavings, turnings or cuttings), fishmeal, iron oxide, iron sponge ,hides, lead nitrate ,lime ,lime chloride ,limestone, magnesia (unslaked), magnesium nitrate, metal sulphide concentrates, Quick lime, peat moss, Potassium chloride, potassium nitrate, salt petre, sawdust, sodium nitrate, sulphur, silicon, zinc, asphalt, bitumen, tar, motor spirits, naphta, turpentine, petroleum and its liquid derivates/products, bones, charcoal, cocoa (but bagged cocoa allowed), coffee (but bagged coffee allowed), fishmeal, rice, cotton copra products, creosoted goods, direct reduced iron, expellers, hot briquetted iron, iron pellets (but Iron Ore allowed), logs (however light logs and timber products allowed), livestock, manioc and manioc pellets ,mobile homes and motor vehicles(Charterers are however permitted to carry mobile homes and motor vehicles as deck cargo only), motor blocks, nigerseeds, oil cakes, palm kernels, pesticides, pollard pellets quebracho, rice (but bagged rice allowed), Seed cakes, sludge ores (ie ores wth high percentage of humidity), slurry, sponge iron, sunflower seed expellers, Tobacco, turnings, arms, ammunition, bombs, black powder, blasting caps, detonatores, detonator caps dynamite ,fireworks, nytroGlycerine, rockets, TNT, radio active and /or nuclear materials and waste, radio isotopes and all cargoes listed under IMO/IMDG Code.

 Charterers are allowed to load any cargoes under appendix 'B' provided to be in strict conformity with ships certificates.

 Charterers to be allowed max 1 cargo each of cement, clinker but only before vessel's dry-dock.

Charterers are allowed max 3 cargoes of bulk salt /not to be the last cargo / in which case prior to loading such cargo crew to wash holds with freshwater and limewash all cargo holds used for such cargo up to specified hight in holds. Charterers to supply and pay for all materials required for washing including freshwater to be used. Charterers to reimburse crew for preparing and removal of limewash at the amount stipulated for intermediate hold cleaning.

## PETCOKE PROTECTIVE CLAUSE

Owners allow two shipments of petcoke, calcinated or green delayed type under Owners special Clause.

a) The petroleum coke mentioned herein is only limited to the type of non hazardous, non dangerous , green delayed type and / or calcined type.
b) If Charterers exercise such option Charterers undertake to use holds as less as possible provided vessel's stability, trim and stress permitting.
c) Such cargo to be loaded stowed trimmed discharged strictly according with latest IMO and any other regulations applicable to such cargo.
d) Should any additional or special wash down of the holds before loading reasonable recommended, proposed or required by the Master , Charterers undertake to arrange the same at their cost and time. Master and crew always cooperate with the Charterers.

**Clause 44 : cont.../...**
e) After discharging, if Master reasonable considered, Charterers to arrange at their expense and time any additional/special wash down of holds caring such cargo by chemicals. Master and crew always cooperate with the Charterers.
f) The petcoke shipment not to be w/i the last two cargoes prior redelivery of the vessel to the Owners.
g) Charterers paying USD 1,000.00 lumpsum over the amount agreed for the lieu of the holds cleaning.

**Clause 45 : Bunkers**
Vessel to be delivered with bunkers about 250/300 metric tons IFO and about 50 metric tons MDO.
Prices as per Rotterdam prices at the date of delivery. Charterers to take over and pay together with 1st hire payment value of bunkers on delivery. Vessel to be redelivered with about same quantities as on delivery.  Same prices to apply bends.
Charterers to deduct estimate value of bunkers on redelivery from last sufficient hire payment(s).

**Clause 46 :**
At or off ports the crew shall open and close the hatches and perform rigging of gear where and when required, if permitted by local regulations and weather.

**Clause 47 :**
Deleted

**Clause 48 :**
Subject to Master's approval which not to be unreasonably withheld, Charterers are allowed to weld on stanchion sockets and/or eye bolts and/or ring bolts as far as needed to secure cargo at Charterer's expense and in Charterer's time. Socket/bolts to be removed and touch up paint at Charterer's expense and in Charterer's time before redelivery if required by Owners.

Charterers are not allowed to weld any of the above on top of tanks.

**Clause 49 :**
Any material supplied by Charterers to be receipted for and delivered to Charterers at their time and expense before redelivery of vessel. Owners/Master not to be responsible for any damage and or loss sustained by stevedores and/or Charterer's servants.

**Clause 50 :**
The Charterers shall provide and pay extra for sweeping and/or washing and/or cleaning of holds between voyages and/or between cargoes provided such work can be undertaken by the crew and is permitted by the local regulations, at the rate of USD 400 per hold. The Owners shall not be responsible if the vessel's holds are not accepted or passed by the port or any other authority. Collection, removal and disposal ashore for any lashing, dunnage, debris materials between intermediate voyages to be arranged by Charterers at their time, risk and expense.

**Clause 50 : cont.../...**
The Charterers shall have the option to re-deliver the vessel with unclean/unswept holds against a lumpsum payment of USD 3,500 in lieu of hold cleaning, excluding dunnage/debris and lashing material.

**Clause 51 :**
Charterers not to be responsible for stevedore or other damage to the vessel unless Master will notify Charterers or their agents in writing in the English language within 24 hours of occurrence of damage, but in any case prior vessel's departure from the port of occurrence, or in case of hidden damage, as soon as practical after discovery of same. Master to cooperate with Charterers and their agents by writing to the party who caused the damage holding them responsible. If time permits, Master together with the agents to arrange for a survey, cost of survey being shared equally between Owners and Charterers, comprising representatives of the parties involved, which to be held to define, estimate and place the responsibility for the damage, but same not to delay the vessel nor prejudice Owner's right of recovery should agreement not be reached or survey not held due to insufficient time.

If during the performance of this Charter Party, stevedores employed by Charterers cause such damage to the vessel which affects her class seaworthiness and/or her working capacity and if such damage should then not be repaired by such stevedores, Charterers will be responsible for cost of such necessary repairs which to be effected before leaving the port of occurrence and the vessel shall remain on hire during such repairs.

Any unrepaired damage not affecting class seaworthiness and/or her working capacity may be repaired in Owner's time during next regular drydock and Charterers to pay repair expenses against vouchers.

Damages affecting class are to be repaired in accordance with the classification society's recommendation.

**Clause 52 :**
Hire and other payments to be paid to:

**NT SHIPPING LTD**
**FIRST INVESTMENT BANK**
**37 , DRAGAN CANKOV STR**
**SOFIA , BULGARIA**
USD IBAN  : **BG06 FINV 9150 10US DOJZ J3**
BIC        : **FINV BGSF**

**Clause 53 :**
Charterers may deduct from the charter hire any amount disbursed for Owner's account with Owner's prior approval. Notwithstanding the contents of Clause 5, charterers may deduct from last sufficient payment of Charter hire the estimated cost of bunkers remaining on board on redelivery and the breakdown of reasonably estimated expenses incurred by charterers for Owner's account, notwithstanding that vouchers may not then have reached Charterers for submission to Owners but always with prior Owner's approval.

**Clause 54 :**
Referring to Lines 60 and 61: where there is any failure to make "punctual and regular payment" including first hire payment and delivery bunker costs, due to omission of Charterer's employees, bankers or agents or otherwise for any reason where there is absence of intention to fail to make payment as set out, Charterers shall be given three banking working days to rectify the failure and where so rectified, the payment shall stand as punctual and regular payment.
Failure by the Charterers to pay the hire within 3 banking days after receiving Owners' notice, shall entitle the Owners to withdraw as set forth in Sub-Clause 5 above.

**Clause 55 :**
Deleted

**Clause 56 :**
The vessel to use Charterer's Bill of Lading, or Bills of Lading approved by Owners, which include New Both-to-Blame Collision Clause, New Jason Clause, Clause Paramount incorporating The Hague Rules (U.S.A./Canadian Clause Paramount, as applicable) or Hague Rules as enacted in countries other than U.S.A./Canada, as applicable, and Conwartime 1993 Clause during the period of this Charter.

Owners authorise Charterers to sign Bills of Lading on behalf of Master, always in accordance with Mate's receipts.

No through Bills of Lading to be issued and used.

In case of non-availability of original Bill(s) of Lading at discharge port(s), Owners/Master to allow discharge / release / change of destination of the entire cargo against a single Letter of Indemnity in Owner's standard P and I Club wording signed by the Charterers only.

Letter of Indemnity to be drawn on Charterer's headed paper and to be faxed to Owners for approval. Original one to be mailed immediately.

In case the vessel will be employed in a Liner service, where it is customary to discharge cargoes without presentation of original Bill(s) of Lading and no Letter of Indemnity is necessary, Charterers will discharge the cargo into the custom custody and hereby guarantee that the cargo(es) will only be released against the presentation of the original Bills of Lading. Owners to confirm Master will be instructed and act accordingly.

Owners guarantee that vessel is governed on full, terms and for the full value of USD 6 million for Hull Insurance during the whole period of this Charter, and that vessel is entered and shall remain for duration of this Charter in "Lloyds and Companies" on full condition.

P & I Club: BRITISH MARINELUXEMBURG

**Clause 58 :**
Charterers to have the benefit of any return insurance premium received by Owners from Underwriters (as and when received) by reason of the vessel being in port for a minimum period of 30 days, provided vessel is on hire, and hire is being paid.

**Clause 59 :**
Any taxes and/or dues on cargo and/or vessel and/or freight and/or sub-hires or calculated on same, other than those levied at domicile of Owners and/or vessel (flag), to be for Charterers' account.

**Clause 60 :**
Hire not to contribute to General Average.

**Clause 61 :**
Deleted

**Clause 62 :**
If, during the currency of this Charter, there is any deviation or any loss of time whatsoever caused by sickness of, or accident to crew or any person on board the vessel (other than Supercargo traveling under Charterer's auspices), hire shall not be paid for the time so lost and the cost of extra bunkers consumed and any other extra expenses incurred shall be for Owner's account.

**Clause 63 :**
In the event of the vessel deviating (which expression included putting back, or putting into any port other than that to which she is bound under the instructions of Charterers) for any cause or for any purpose which would result in payment of hire being suspended under any provision of this Charter, no hire shall in any case be payable as from commencement of such deviation until the time when the vessel is again ready and in efficient state to resume her service from a position not less favourable to Charterers than that at which the deviation commenced. In the event of the vessel, for any cause or for any purpose aforesaid, putting into any port other than the port for which she is bound on the instructions of Charterers, the port charges, pilotage and other expenses at such port shall be borne by Owners.

**Clause 64 :**
In the event of the vessel being denied or restricted in the use of port (except as provided in Clause 69) and/or loading and/or discharging facilities or shore labour and/or tug or pilotage assistance because cit the vessel's flag or ownership or management or the wages or conditions of employment of her officers and/or crew or of the officers and/or crew of any other vessel under the same ownership or management or any other vessel as aforesaid, hire shall cease for the time thereby actually lost and Owners shall be responsible for and shall promptly reimburse Charterers all extra, direct expenses which Charterers may incur in trying to solve the situation (including proceeding to all alternative port or ports). If the vessel remains idle for thirty consecutive days because of any of the abovementioned causes, Charterers shall have the right to cancel the balance of the Charter without prejudice to any claim they may otherwise have on the Owners, provided vessel is empty.

**Clause 65 :**
Should the vessel be arrested during the currency of this Charter at the suit of any person having or purporting to have a claim against or any interest in the vessel, hire under this Charter shall not be payable in respect of any period whilst the vessel remains unemployed as a result of such arrest and Owners shall reimburse to the Charterers any expenditure which they may incur under this Charter in respect of any period during which by virtue of the operation of the clause no hire is payable. This clause shall not apply should the arrest be

**Clause 65 : cont.../...**
caused through any fault on the part of Charterers (or related companies, affiliates and Sub-Charterers).

The Charterers may in their option, partly or wholly, add any off hire period(s) to the Time charter period.

**Clause 66 :**
**M/V "PIRGOS"**
-OWNERS : NT SHIPPING MARSHALL ISL
-VESSEL'S EX NAME :SEA PATRON
-TYPE OF VESSEL :IHI FREEDOM MKII OPEN TYPE MPP GENERAL CARGO, RETRACTABLE TWEENDECKS MAKING VSL CLEAR AND UNOBSTRACTED SIDKR EXCEPT NR.1 WHERE SMALL TWNDK SHELF REMAINS AT PORT AND STARBOARD SIDE ONLY WHICH FITTED WITH BLK CGO FEEDERS.
  TWEENDECK IN HOLD NR.3 HAS BEEN PERMANENTLY REMOVED MAKING HOLD SINGLE DECK
-BUILT :SEPTEMBER 1980
-FLAG :ST.VINCENT AND THE GRENADINES
-UNDERWRITERS : BUSLTRAD - H+M VALUE USD 4.8 MIL
-P AND I CLUB : BRITISH MARINELUXEMBURG
-CLASS :LLOYDS 100A1
  HOLD 3 MAY BE EMPTY AND FILLED WITH WATER
  WHEN IN BALLAST AND IF VSL CARRIES LESS THAN
  4000 MTS CGO.VESSEL NOT TO BE PUT OFF-HIRE FOR THE TIME NECESSARY TO DEBALLAST AND/OR BALLAST HOLD NR.3 OR FOR THE TIME NECESSARY TO CLEAN AND DRY THAT HOLD TO AN ACCEPTABLE LOADING CONDITION WHEN VESSEL ARRIVES IN A LOADING PORT WITH HOLD NR.3 BALLASTED
-DWAT/DRAFT :17167 MTS / 9.500 MS /SUMMER/
  17670 MTS / 9.680 MS /TROPICAL/
  16663 MTS / 9.300 MS /WINTER/
-GRT/NRT :10.230.00 / 6.259 /INTER/
  10.794.15 / 9.028,69 /SUEZ/
  11.114.03 / 9.306,26 /PANAMA/
-LOA :145.50
-BEAM :21.00
-DEPTH MOULDED :13.10 /ALL IN METERS/
-TPC :25.50
-FWA :209 MM
-CAPACITIES

| | GRAIN | | | BALE | | |
|---|---|---|---|---|---|---|
| -NO.1 HOLD | 2,801,7 CBM / | 98.941 | CFT | 2,556,8 CBM / | 90.293 | CFT |
| -NO 2 HOLD | 3,527,3 CBM / | 124.563 | CFT | 3,218,1 CBM / | 113.646 | CFT |
| -NO 3 HOLD | 3,779,8 CBM / | 133.482 | CFT | 3,782,3 CBM / | 133.570 | CFT |
| -NO 4 HOLD | 3,481,0 CBM / | 122.930 | CFT | 3,176,0 CBM / | 112.159 | CFT |
| -NO 5 HOLD | 3,116,2 CBM / | 110.048 | CFT | 2,822,0 CBM / | 99.658 | CFT |
| -NO 1 TWD | 858,6 CBM / | 30.321 | CFT | 1,038,4 CBM / | 36.671 | CFT |
| -NO 2 TWD | 888,0 CBM / | 31.359 | CFT | 1,178,3 CBM / | 41.611 | CFT |
| -NO 4 TWD | 888,0 CBM / | 31.359 | CFT | 1,181,8 CBM / | 41.735 | CFT |
| -NO 5 TWD | 888,0 CBM / | 31.359 | CFT | 1,171,0 CBM / | 41.353 | CFT |
| -NO 1 HATCH | 134,8 CBM / | 4.760 | CFT | 134,8 CBM / | 4.760 | CFT |
| -NO 2 HATCH | 210,3 CBM / | 7.427 | CFT | 210,3 CBM / | 7.427 | CFT |
| -NO 3 HATCH | 178,8 CBM / | 6.314 | CFT | 178,8 CBM / | 6.314 | CFT |
| -NO 4 HATCH | 210,3 CBM / | 7.427 | CFT | 210,3 CBM / | 7.427 | CFT |

**Clause 66 : cont.../...**

```
-NO 5 HATCH   210,3 CBM /   7.427 CFT    210,3 CBM /   7.427 CFT
                            --------------   ------------------
GRAND TOTAL  21,173,1 CBM / 747.717 CFT  21,069,2 CBM / 744.051 CFT
                            --------------   ------------------
```

```
-5 HO :HYDRAULIC AUT. OPERATED FOLDING STEEL
 COVERS FOLDING TO ONE SIDE AS FOLL : TWO JACKNIFING PANELS PER
 HOLD NO 1+3+5 AFT-NO 2+4 FORE
```

```
-5 HA :HYDRAULIC STEEL COVERS - 4 PANELS PER   HOLD SEPARATED 2 IN
 FORE AND 2 IN AFT TWEEN DECK
-HATCH OPENINGS :
```

|       | L     | X | W     | X | H /IN MTRS/ |
|-------|-------|---|-------|---|-------------|
| NR 1  | 15.00 | X | 10.00 | X | 0.9         |
| NR 2  | 15.00 | X | 15.60 | X | 0.9         |
| NR 3  | 12.75 | X | 15.60 | X | 0.9         |
| NR 4  | 15.00 | X | 15.60 | X | 0.9         |
| NR 5  | 15.00 | X | 15.60 | X | 0.9         |

```
-TWEENDECK DIMENSIONS
```

|       | L       | X | W     |
|-------|---------|---|-------|
| NR 1  | 17.80   | X | 10.00 |
| NR 2  | 17.80   | X | 15.60 |
| NR 3  | REMOVED |   |       |
| NR 4  | 17.80   | X | 15.60 |
| NR 5  | 17.80   | X | 15.60 |

```
-AREA ON TANK TOP /EXCEPTED WELL BHD CORRUGATION/:
```

|      |     |     |
|------|-----|-----|
| NR 1 | 241 | SQM |
| NR 2 | 387 | SQM |
| NR 3 | 340 | SQM |
| NR 4 | 391 | SQM |
| NR 5 | 268 | SQM |

```
       --------------
TOTAL 1627 SQM
```

```
-AREA ON RETRACTABLE TWEEN-DECKS /EXCEPT WELL BHD CORRUGATION/ :
```

|      |         |     |
|------|---------|-----|
| NR 1 | 284     | SQM |
| NR 2 | 315     | SQM |
| NR 3 | REMOVED |     |
| NR 4 | 315     | SQM |
| NR 5 | 315     | SQM |

```
       --------------
TOTAL 1229 SQM
```

```
LOWER HOLD DIMENSIONS :
                        WIDTH FWD / AFT X LENGTH / IN METERS/
```

|          | WIDTH FWD / AFT X LENGTH / IN METERS/ |
|----------|----------------------------------------|
| HOLD NR 1 | 5.5  / 16.5 X 20.5                     |
| HOLD NR 2 | 16.5 / 20.0 X 20.0                     |
| HOLD NR 3 | 20.0 / 20.0 X 17.0                     |
| HOLD NR 4 | 20.0 / 18.0 X 20.0                     |
| HOLD NR 5 | 18.0 /  7.5 X 20.0                     |

**Clause 66 : cont.../...**

-TWEENDECK DIMENSION :
```
                        WIDTH FWD  /  AFT X LENGTH / IN METRES/
HOLD NR 1                  9.0    / 15.5   X  20.5
HOLD NR 2                 15.5    / 15.5   X  20.0
HOLD NR 3                 15.5    / 15.5   X  17.0
HOLD NR 4                 15.5    / 15.5   X  20.0
HOLD NR 5                 15.5    / 15.5   X  20.0
```

-GEAR TYPE / NO / SWL :HORIZONTAL SLEWING CRANES 5 X 25 MTS
MAX. OUTREACH          :6.10 MTRS
 /THE PROPER WORKING OF CRANES IS GIVEN IN ATMOSPHERIC TEMPERATURE RANGE
 +30/-5 DEGREES CELCIUS/

-MAXIMUM ADMISSABLE PAY LOADS / IN MT PER SQM/
-----------------------------------------------------------------
```
 STRENTH OF WEATHER DECK             :  2.30 MTS / SQM
 STRENTH OF HATCH COVERS             :  1.85 MTS / SQM
 STRENTH OF TANK TOP HOLDS 2+4       : 13.40 MTS / SQM
 STRENTH OF TANK TOP HOLDS 1+5       : 12.30 MTS / SQM
 STRENTH OF TANK TOP HOLD 3          : 12.80 MTS / SQM
 STRENTH OF TWEEN DECK               :  2.13 MTS / SQM
```

-TANK CAPACITIES  : IFO :  1100 CBM / BSS 100% /
```
                    MDO:   165 CBM / BSS 100% /
                    FW  :   125 CBM / BSS 100% /
                    BW  : 6330 CBM / INCL. NO 3
```

 CARGO HOLD : 4222 CBM/

-CONTAINER LOADING / NOMINAL/    :
----------------------------------------------------
/NO LASHING MATERIALS / CONTAINER FITTINGS /
TTL  TEU  / 8  X  8  X  20  / :   431  /  176 ON DECK + 255 UNDER DECK/
TTL  FEU  / 8  X  8  X  40  / :   201  /   76  ON DECK + 125 UNDER DECK/

-SPEED / CONSUMPTION
------------------------------------
ABT 12.0 KN ON ABT 16 MTS IFO 120 CST PLUS ABT 0.20 T MDO IN FAIR
WEATHER CONDITIONS , UNDER BF 4

PORT CONSUMPTION IDLE : ABT 1.0 MT MDO PLUS ABT 0.3 MTS IFO AND ABOUT 2.50
MT MDO PLUS ABT 0.3 MT IFO WHEN GEAR WORKING

VSL USES MDO WHILE MANOEUVERING / NAVIGATING CONFINED / RESTRICTED WATERS
/ CANALS / RIVERS , WHEN SAILING IN BAD WEATHER / ROUGH SEAS AND IN /
OUT OF PORTS / LOCKS , ON STAND BY , ETC.

THE SPEED OF THE VESSEL IS ALWAYS TO BE CONSIDERED AS AVERAGE SPEED
IN FULLY LADEN CONDITION AND GOOD WEATHER IS DEFINED AS NO ADVERSE
CURRENT ,

**Clause 66 : cont.../...**
NEGATIVE INFLUENCE OF SWELL , MODERATE SEA , WIND NOT EXCEEDING BEAUFORT
FORCE 4 / FOUR / AND / OR DOUGLAS SEA STATE 3 /THREE/

BUNKER SPECIFICATIONS :
---------------------------------------
  IFO : ISO  8217 - 1996 / E /  GRADE ISO - F - RME 25 / 120 CST/
  MDO : ISO  8217 - 1996 /     GRADE ISO - F - DMB

-VESSEL HAS FLUSH TWEENS EXCEPT HOLD NR 3
-VESSEL IS NOT ITF FITTED
-NATIONALITY OF MASTER / OFFICERS / CREW :
  BULGARIAN / BULGARIANS & UKRAINIANS / BULGARIANS AND ROMANIANS
-ABT 250 MTONS STORES / CONSTANTS EXCL FW
-VENTILATION OF HOLDS / NBR OF AIRCHANGES : ELECTRICAL 0.5 A/C
  PER HOUR BSS EMPTY HOLDS
-VESSEL'S DAILY WATER CONSUMPTION        : ABT 8-10 MTS PD
                     EVAPORATOR PRODUCTION : ABT   10 MTS


**Clause 67 :**
Deleted


**Clause 68 :**
Trading always within institute warranty limits, always afloat always accessible (except where is  customary to lie safely aground at Argentina, Brasil and Buenaventura where NAABSA to apply, always via safe ports, safe berths, safe anchorages.
Excluding Cuba, Israel, Iraq, Angola, Lybia, Cabinda, Ethiopia, Eritrea, Nigeria (but Lagos allowed), Sri Lanka (but Colombo allowed if no war zone declared), Republic of Yemen, Cape horn transiting, Hudson Bay, Turkish Occupied Cyprus, Syria, Somalia, North Korea, Pacific Coast of Russia, any war and warlike zones, no direct trading between china and  Taiwan and between Turkey/Cyprus.

Extra war risk premium at hull, machinery and crew for Persian Gulf, Arabian Gulf, Red Sea, Gulf of Aqaba and gulf of Oman will be for Charterers account.

Magellan strait allowed but Charterers to present all required local navigation charterers as well as pilots at their acct, as per master's request.

Tunisia is permitted for discharging against owners protecting clause:
In completion of discharge at any Tunisian ports Charterers to arrange vessel's departure without delay. Charterers undertake Owners against any claim which may arise by the receivers side or any third parties including custom office and or local court procedure for shortlanded cargo, detention and/or arrest thereof, bank guaranty, direct payment of the claimed amount to the receivers.
Vessel to remain always on hire.

Charterers option to breach I.W.L., but always against Owners agreement/confirmation which not to be unreasonably withheld and Charterers reimbursement of extra insurance according owns underwriters quotation corresponding to the H+M value and franchize premium given by owns underwriters which not to exceed Lloyds of London.
Vessel not to be ordered to breach ice, to enter or leaving any ice port.
Any time lost and extra expenses that may have occurred due to that act will be at charterers responsibility/account.

**Clause 68 : cont.../...**

**Amazon river protective clause**
Amazon River up to Itacoatiara allowed in accordance with Owners' Protective Clause :
a) Amazon River in/out pilot to be arranged as from/to Punta do Guara Pilot Station, (located into the Bara Norte) up to Fazendinha only in case same is compulsory. From Fazendinha to Munguba same will be for Charterers' account. Charterers to grant no draft restrictions. Fazendinha up to Munguba vessel to be always afloat, always accessible.
 b) Charterers to hire local nautical charts for Amazon River, tide tables and publications, which to be handed over to the Master by the first inward pilot and returned to the last outward pilot. If Master miss some necessary Charterers for entering Amazon river up to Fazendinha same to be supplied in present discharge port. Charterers agents to fix official buoys positions  from Bara Norte to Fazendihna in accordance with local authorities.
c) Additional mooring ropes and equipment, tug boats for proper mooring and safely vessel's stay at loading place to be arranged, if required by Master always in line with local regulations/custom, by Charterers for their time and account. Time and bunker used for shifting vessel alongside berth silos elevator to be on hire.
 d) In case Master/Pilot decide to stop vessel when navigating in/out Amazon River for the purpose of lack of sufficient water/waiting high water or safety navigating (heavy rains, lack of visibility, other ship in trouble etc.) all such waiting time to be considered on hire.

**Orinocco river protective clause**
Orinoco River up to Matanzas allowed in accordance with Owners' Protective Clause :

a) Orinocco River in/out pilot to be arranged as from/to Orinocco SEA BUOY-MILE 28 up to Matanzas and same will be for Charterers' account.
b) Charterers to hire local nautical charts for Orinoco River, tide tables and publications, which to be handed over to the Master by the first inward pilot and returned to the last outward pilot.
c) Additional mooring ropes and equipment, tug boats for proper mooring and safely vessel's stay at loading place to be arranged, as per Master request, by Charterers for their time and account. Time and bunker used for shifting vessel alongside berth silos elevator to be on hire.
d) In case Master/Pilot decide to stop vessel when navigating in/out Orinoco River for the purpose of lack of suffusion water/waiting high water or safety navigating (heavy rains, lack of visibility, other ship in trouble etc.) all such waiting time to be considered on hire.


**Clause 69 :**
Charterer's agents to attend Owners/vessel minor usual services free of charge but all expenses incurred to be for Owner's account.


**Clause 70 :**
Vessel to work day and night if required by Charterers, and all cranes to be at Charterer's disposal during loading/discharging. In the event of a disabled crane or cranes or insufficient power to operate cranes, the hire to be suspended pro-rata for the number of working cranes available unless damage caused by stevedore's or Charterer's servants. If, however, Charterers/owners arrange shore crane(s) at Owner's expense to replace the disabled crane/cranes, then hire not to be suspended. In either case, all proven, direct expense including stevedores stand-by expenses except incurred by mishandling of stevedores, to be for Owner's account.

**Clause 71 :**
Watchmen for vessel to be for Owner's account and watchmen for cargo to be for Charterer's account. Cost of compulsory watchmen to be for Charterer's account.


**Clause 72 :**
It is expressly agreed by Owners and Charterers that Charterers have the option of using rubber wheeled forklift trucks/bulldozers/pay loaders on board the vessel subject to tanktop strengths and Master's approval which not to be unreasonably withheld.


**Clause 73 :**
Cargo claims to be settled according to the NYPE Interclub Agreement 1996 and any subsequent amendments thereto. No party to grant time extensions or settle any claims without the previous consent of the other party, which not to be unreasonably withheld.


**Clause 74 :**
If cargo is loaded on deck/hatchcovers, same always to be within vessel's deck/hatch cover strengths and is to be loaded at Master's discretion and under his supervision. However, always to be at Charterer's risk and expense. Charterers also to be responsible for any damage caused to hull and/or machinery and/or other cargo carried as a result of the carriage of cargo on deck/hatchcovers. All Bills of Lading for deck/hatch cover cargo to bear the following wording:
 "Shipped on deck at Charterers, Shippers, Receivers, risk, expense, responsibility, without any liability on the part of the vessel or her Owners for any loss, damage, expense or delay howsoever caused, even if due to Carrier's negligence". All Bills of Lading for deck/hatch cover cargo to the U.S.A. and all of its territories to be claused as follows : In respect of goods carried on deck and stated herein to be so carried  (hereinafter on deck carriage), all risks of loss or damage inherent in such on deck carriage shall be borne by the Shipper(s) and Consignee(s) but in all other respects shall be governed by the terms of this Bill of Lading and the provisions of the United States Carriage of goods by Sea Act, 1936, notwithstanding Section 1 (C) thereof.

Stanchions/lashing materials required to secure the deck cargo, to be supplied by Charterers at their time and expense. Any gear/stanchions/lashing etc. supplied by Charterers to remain Charterer's property and to be delivered to Charterer's port agents prior to vessel's redelivery at Charterer's time and expense. Deck cargo, if any, to be loaded /stowed /dunnaged /lashed /secured /unlashed by shore hands at Charterer's time and expense.


**Clause 75 :**
If major war breaks out between any two or more of the following countries: Great Britain, U.S.A., C.I.S., People's Republic of China, Japan, Philippines, Germany and Greece, directly affecting the performing of this Charter Party, both Owners and Charterers shall have the right of cancelling this Charter Party, provided vessel is free of cargo.


**Clause 76 :**
Deleted.


**Clause 77 :**
Drydock
No drydocking except in case of an emergency.

**Clause 78 :**
Arbitration
Should any dispute arise between the Owners and the Charterers, the matter in dispute shall be referred to two persons at London, one to be appointed by each of the parties hereto and a third, an umpire, to be chosen by the two parties in case these arbitrators disagree in their decision and that decision of the umpire shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the court. The arbitrators shall be commercial men and English Law to apply. Notwithstanding the above, disputes involving amounts up to USD50 000 shall be handled according to L.M.A.A.'s small claim procedure, English Law to apply.

Any claim shall be notified to the other party and arbitrator nominated within 12 months from vessel's redelivery, failing which all claims will be considered as being time barred.

**Clause 79 :**
Owners during the currency of this Charter to have the option of selling their vessel, however, new Owners to be responsible for the fulfillment of all terms and conditions of this Charter Party.

Such sale shall be subjected to Charterer's prior approval which is not to be unreasonably withheld.

**Clause 80 :**
Deleted

**Clause 81 :**
This fixture to be kept strictly private and confidential.

**Clause 82 :**
Deleted

**Clause 83 :**
Deleted

**Clause 84 :**
The vessel will arrive at first loadport with approximately 120 MT fresh water on board. Owners to allow stevedores to use fresh water for cooking and washing purposes. Charterers to pay actual cost.

**Clause 85 :**
Garbage dues for Owner's account.

**Clause 86 :**
Deleted

**Clause 87 :**
Local time to apply for cancelling date/time, but GMT to apply for delivery and redelivery.

**Clause 88 :**
Owner's option to arrange by their own P & I Club a preshipment condition survey if intended cargo to be loaded steel, newsprint and/or other unpacked manufactured merchandise, at Owner's expense. The remarks of such survey to be inserted in the Mate's receipts, consequently in the Bills of Lading.

**Clause 89 :**
No direct sailing between Taipei and PRC.

**Clause 90 :**
Charterers shall not permit the issue of any Bill of Lading, waybill or other document evidencing a contract of carriage (whether or not signed on behalf of the Owners or on the Charterer's behalf or on behalf of any Sub-Charterers) incorporating, where not compulsorily applicable, the Hamburg Rules or any other legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague/Visby Rules. The Charterers shall indemnify the Owners against liability, loss or damage which may result from any breach of the foregoing provisions of this clause.

**Clause 91 :**
Deleted

**Clause 92 :**
Master/Chief Officer are requested to give full co-operation in signing Mate's receipts at load ports twice a day - once in the morning and in the afternoon. Mate's receipts to be signed only for cargo already shipped in full.

**Clause 93 :**
Financial Responsibility in respect of Pollution (all ships other than self-propelled tank vessels and non-self propelled tank vessels carrying more than 2,000 Tons of persistent oil in bulk as cargo).

(1) Owners warrant that throughout the currency of this Charter they will provide the vessels with the following certificates:

(a) Certificates issued pursuant to section 1016 (a) of the Oil Pollution Act 1990, and section 108 (a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended, in accordance with part 138 of Coast Guard Regulations 33 CFR, from (indicate the earliest date upon which the Owners may be required to deliver the vessel into the charter), so long as these can be obtained by the Owners from or by (identify the applicable scheme or schemes).
(b) Deleted
(2) Notwithstanding anything whether printed or typed herein to the contrary,

**Clause 93 : cont.../...**

(a) save as required for compliance with paragraph (1) hereof, Owners shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this Charter.

(b) Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

(c) Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any Bill of Lading issued pursuant to this Charter may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

(3) Charterers warrant that the terms of this Clause will be incorporated effectively into any Bill of Lading issued pursuant to this Charter.

**Clause 94 :**
Bulk Carrier Safety Clause

a. The Charterers shall instruct the Terminal Operators or their representatives to cooperate with the Master in completing the IMO SHIP/SHORE SAFETY CHECKLIST and shall arrange all cargo operations strictly in accordance with the guidelines set out therein.

b. In addition to the above and notwithstanding any provision in this Charter Party in respect of loading/discharging rates, the Charterers shall instruct the Terminal Operators to load/discharge the vessel in accordance with the loading/discharging plan, which shall be approved by the Master with due regard to the vessel's draught, trim, stability, stress or any other factor which may affect the safety of the vessel.

c. At any time during cargo operations the Master may, if he deems it necessary for reasons of safety of the vessel, instruct the Terminal Operators or their representatives to slow down or stop the loading or discharging.

d. Compliance with the provisions of this Clause shall not affect the counting of laytime.

**Clause 95 :**
If containers to be loaded, the Charterers or their representatives are to furnish to the Master with weight of containers and are responsible for any direct consequences, delays, and expenses as may arise from lack of containers-weight and/or discrepancies between manifest and actual container-weights. The Charterers will endeavour to load only sealed laden containers and Owners not to be responsible for the contents of containers, whether sealed or not sealed. Owners not to be responsible for the shortage or damage to cargo inside the containers.

**Clause 96 :**
Redelivery
On dropping last outward sea pilot one safe port in Charterers option following ranges at any time day/night Sundays and holidays included :
Boston/Bahia Blanca range including Carribs/ECCS/NCSA
Baltic/Gibraltar range including UK/Eire
Full Mediterranean including Black Sea
Gibraltar/Durban range

**Clause 97 :**
BIMCO Standard ISM Clause to apply throughout the currency of this Charter Party.

From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charter party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter party, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account."

**Clause 98 :**
Deleted

**Clause 99 :**
It is agreed that should Master request a pilot for Dardanelles, then same will be appointed and paid for by Owners. (Bosphorus pilot Charterer's account).

**Clause 100 :**
Deleted

**Clause 101 :**
Hire
USD 15,425 daily including overtime.

**Clause 102 :**
Owners guarantee that they are to be fully responsible for discharging the cargo at the port as stated in the Bill of Lading.

**Clause 103 : Host test**
Charterers to have the option to hose test the vessel's hatchcovers at the loading ports at their time/expense and should same not be watertight, Owners have the obligations to arrange necessary measures in order to make the hatch covers fully watertight. Owners shall be given by Charterers 5 working days after which if the hatch covers are not watertight, Charterers have the right to cancel this charter party and redeliver the vessel, provided no cargo on board.

**Clause 104 :**
War risk insurance Clause
Charterers to have the option to trade to war or warlike zones. Basic annual war risk insurance to be for Owner's account. Additional war risk premia as imposed by vessel's war risk underwriters, including crew war bonus and vessel's blocking and trapping, to be for Charterer's account and to be refunded to Owners by Charterers against copies of relevant debit notes but same to be based on minimum rates of Lloyds of London Underwriters Committee. War risk underwriters' orders always to be followed.

Conwartime 1993 to be incorporated in the Charter Party.


**Clause 105 :**
Charterers have the right to load and/or discharge on double banking basis or by any other means available at loading and/or discharging port or place always subject to Master's reasonable satisfaction and any additional equipment/facilities such as fenders, whenever considered necessary by the Master, are to be supplied by the Charterers in their time and at their expense.

If at any time during the operation , the Master reasonably considers it unsafe to continue due to adverse weather conditions etc., he may order the other vessel(s) and/or barge(s) away from his vessel or remove his own vessel in order to avoid prejudicing the safety of the vessel(s). any additional insurance premium net of all rebates, if required by vessel's underwriters to be for Charterer's account.


**Clause 106 :**
The Charterers may in their option, partly or wholly, add any off-hire period(s) to the time charter period.

During any off-hire period estimated to exceed 8 days, the Owners to give the Charterers not less than 5 days definite notice of resumption of the service.

If the vessel has been excluding drydock off-hire for a period of more than 20 consecutive days, the Charterers are at liberty to cancel the balance of this charter party, in which case redelivery shall take place upon vessel being free from cargo, irrespective of redelivery ranges.


**Clause 107 :**
The Charterers may supply an independent weather bureau advice to the Master, during voyages specified by the Charterers and the Master shall comply with the reporting procedure of the weather bureau, however, the Master remains responsible for the safe navigation and choice of route. Therefore, Master at his reasonable discretion not to follow suggested route if he considers it dangerous for the safety of the vessel. Alternatively, Charterers have the option to instruct the Master to report daily to a weather bureau during the execution of sea voyages. The weather bureau will subsequently produce a performance analysis report which to include both and take into consideration both speed and consumption.

Evidence of weather conditions shall be taken from the vessel's deck logs and independent weather bureau's reports. In the event of discrepancy between the deck logs and the full independent weather bureau's reports, the independent weather bureau's reports shall be final and binding on both parties.

**Clause 108 : ISPS/MTSA CLAUSE FOR TIME CHARTER PARTIES 2005**

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

**Clause 109 : Dry Dock Clause**

The vessel is scheduled for dry dock between 31 January - 30 May, 2008 and Owners intend to perform dry-dock in Mediterranean Sea / Black Sea.
Therefore Charterers undertake to fix the vessel direction Mediterranean / Black Sea in order to redeliver to Owners for dry docking on dropping last outward sea pilot one safe port in Charterers' option Mediterranean / Black Sea during this period. Charterers to give 25 days/15/10/5/3/1 notice about estimated time redelivery for dry dock. Duration of dry dock will be about 40-50 days. Owners will give Charterers 20/15/10/7/5/3/1 days notice of delivery.

19

**Clause 109 : cont.../...**

Vessel shall be off-hire while ballasting, if any, from the above stipulated port to the first or sole repair yard port as well as during drydock. Vessel shall be delivered to Charterers and hire shall resume on dropping last outward sea pilot at sole or last repair yard port Mediterranean / Black Sea port in Owners' option. Charterers option to add off-hire period to the total duration of charter party.

Owners shall replenish bunkers used while vessel is off-hire for drydock and any difference in bunker quantities shall be settled at published Piraeus Bunker prices on a day of delivery or first day after delivery back to Charterers.

**THE OWNERS**                         **THE CHARTERERS**

**NEW BOTH-TO-BLAME COLLISION CLAUSE**
If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following Clause shall apply:

**BOTH-TO-BLAME COLLISION CLAUSE**
"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her owners to the owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact".

and the Charterers shall ensure that all Bills of Lading issued under this Charter Party shall contain the same clause.

**GENERAL AVERAGE AND THE NEW JASON CLAUSE**
General Average shall be payable according to the York / .Antwerp Rules, 1974, and any subsequent amendments, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:

**NEW JASON CLAUSE**
"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and! shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if such salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery'.

and the Charterers shall ensure that all Bills of Lading issued under this Charter Party shall contain the same Clause.

**GENERAL PARAMOUNT CLAUSE**
All the Bills of Lading issued under this Charter Party shall contain the following Clause :

This Bill of Lading shall have effect subject to the provisions of any legislation relating to the carriage of goods by sea which incorporates the rules relating to Bills of Lading contained in the International Convention, dated Brussels, 25th August 1924 and which is compulsory applicable to the contract of carriage herein contained. Such legislation shall be deemed to be incorporated herein, but nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities hereunder. If any return of this Bill of Lading be repugnant to any extent to any legislation by this clause incorporated, such term shall be void to that extent but no further. Nothing in this Bill of Lading shall operate to limit or deprive the carrier of any statutory protection or exemption from, of limitation of, liability.

**BIMCO STANDARD WAR RISKS CLAUSE FOR TIME CHARTERS, 1993**
**CODE NAME: "CONWARTIME 1993"**
1. For the purpose of this Clause, the words:

a. "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the vessel, and the Master, and

b. "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the vessel, her cargo, crew or other persons on board the vessel.

2. The vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the vessel, her cargo, crew or other persons on board the vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

3. The vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

4. a. The Owners may effect War Risks insurance in respect of the Hull and Machinery of the vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

b. If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterer's orders, the vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be

reimbursed by the Charterers to the Owners at the sane time as the next payment of hire is due.

5. If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

6. The vessel shall have liberty:
a. to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

b. to comply with the order, directions or recommendations of any War Risks underwriters who have the authority to give the same under the tens of the War Risks insurance;

c. to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject and to obey the orders and directions of those who are charged with their enforcement;

d. to divert and discharge at any other port any cargo or part thereof which may render the vessel liable to confiscation as a contraband carrier;

e. to divert and call at any other port to change the crew or any part thereof or other persons on board the vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

7, If, in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owner's intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

8. If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

**U.S. Customs-Trade Partnership (C-TPAT) Clause:**
The Charterers have voluntarily signed the C-TPAT Agreement with the U.S. Customs Service. The Owners, Master and Crew will use reasonable efforts to assist the Charterers to comply with their obligations under the C-TPAT Agreement. However, under no circumstances shall the Owners, Master and Crew be liable for any delays, losses or damages howsoever arising out of any failure to meet the requirements of the C-TPAT Agreement signed by the Charterers.

The Charterers agree to indemnify and hold the Owners, Master and Crew harmless for any claims made against the Owners, Master and Crew or for any delays, losses, damages, expenses or penalties suffered by the Owners arising out of the C-TPAT Agreement signed by the Charterers.

**US Customs Advance Notification/AMS Clause for Time Charter Parties:**
(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i)    Have in place a SCAC (Standard Carrier Alpha Code);
ii)    Have in place an ICB (International Carrier Bond);
iii)   Provide the Owners with a timely confirmation of i) and ii) above; and
iv)   Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

**BIMCO Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005:**
 (a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and

(ii) the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause
(a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

TRAMP MARITIME ENTERPRISES LTD,

                                        Plaintiff,                    08 CV   9926(RMB)

-v-
                                                                     **VERIFICATION OF**
NT SHIPPING MARSHALL ISLANDS,                                        **COMPLAINT**

                                        Defendant.

-------------------------------------------------------------x


       Pursuant to 28 U.S.C. §1746, GEORGE M. CHALOS, Esq., declares under the penalty of perjury:

    1.    I am a Member of the law firm of CHALOS & CO, P.C., counsel for the Plaintiff, TRAMP MARITIME ENTERPRISES LTD, herein;

    2.    I have read the foregoing Verified Complaint and know the contents thereof; and

    3.    I believe the matters to be true based on documents and information obtained from employees and representatives of the Plaintiff through its agents, underwriters and attorneys.

    4.    The reason that this verification was made by deponent and not by the Plaintiff is because Plaintiff is a foreign corporation, whose officers are not in this district, and whose verification cannot be obtained within the time constraints presented by the circumstances of this case.

    I declare under penalty of perjury that the foregoing is true and correct.

Dated: Oyster Bay, New York
       November 17, 2008

                     CHALOS & CO, P.C.
                     Attorneys for Plaintiff
                     TRAMP MARITIME ENTERPRISES LTD.

          By:   _____
                     George M. Chalos (GC-8693)
                     123 South Street
                     Oyster Bay, New York 11771
                     Tel: (516) 714-4300
                     Fax: (866) 702-4577
                     Email: gmc@chaloslaw.com